UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ROBERT M. SHOOP,                          :
Individually and as Executor,             :
etc., et al.,                             :
                                          :
            Plaintiffs,                    :
                                          :
v.                                        : ACTION NO.  4:10CV125
                                          :
LIFE INSURANCE COMPANY OF NORTH           :
AMERICA,                                  :
                                          :
            Defendant.                     :

### REPORT AND RECOMMENDATION

Pending motions in this case present two related questions. First, whether Peter Shoop was covered under a group insurance policy issued by the Defendant, Life Insurance Company of North America (LINA) when Shoop died on April 28, 2009, and second, whether LINA's decision that he was not covered, and its resulting denial of benefits are reviewed de novo by this Court. Because the undersigned concludes the answer to both questions is "yes", this report recommends that the Court grant Plaintiffs' Motion for Summary Judgment, deny LINA's motion and enter judgment for the benefits due under the Policy.

1

## Procedural History

Beneficiaries, and plaintiffs in this case, Robert and Michael Shoop, ("beneficiaries") initiated this civil action against Life Insurance Company of North America ("LINA") seeking $750,000 that they claim is owed by LINA under their deceased father's accidental death and dismemberment policy number OK980037 (the "Policy"). Their father, Peter Shoop, ("Shoop") was an employee of Northrop Grumman Corporation ("Northrop Grumman") until he was laid off due to a reduction in force on April 7, 2009. (ECF No. 15 at 1).

While employed by Northrop Grumman, Peter Shoop participated in the optional accidental death and dismemberment policy offered by Northrop Grumman through LINA. Id. On April 28, 2009, Shoop died as a result of a car accident. The Shoops submitted a claim for benefits, but LINA determined that Peter Shoop was no longer covered by the Policy at the time of his death. The Company paid the beneficiaries $250,000 under the conversion provision of the Policy. The Plaintiffs claim that they are owed the full amount of coverage under the Policy, $1,000,000.00, and filed this ERISA action for the additional $750,000 in benefits. (ECF No. 1).

2

The parties stipulated to the relevant facts and filed cross motions for summary judgment with memoranda in support. (ECF Nos. 13, 14, 15, 24, and 25). The motions were referred to the undersigned for a Report and Recommendation, and the Court heard oral argument on June 14, 2011. For the reasons that follow, the undersigned recommends that the Court GRANT the beneficiaries' motion for summary judgment, DENY LINA's motion for summary judgment, and enter judgment for the remaining benefits in favor of the Plaintiffs.

## A.   RECOMMENDED FINDINGS OF UNDISPUTED MATERIAL FACT

Peter Shoop was an employee of Northrop Grumman Corporation until April 7, 2009. (ECF No. 15 at 1).[1] As an active, full-time employee, he was eligible for, elected, and maintained optional accidental death and dismemberment insurance coverage through LINA in the amount of $1,000,000 (the "Policy"). Id. at 2; (ECF No. 1-2 at 3, 11). The Policy provides optional insurance coverage to eligible employees based on a Schedule of Benefits set out in the Policy document. (ECF No. 1-2 at 11). The Schedule of Benefits defines as "eligible" those persons belonging to a Covered Class. (ECF No. 1-2 at 3, 11). The Policy includes only one Covered Class, Class 1, which is described in the Schedule of Benefits to include "All active,

---

[1] Most citations are to the parties' Agreed Stipulation of Facts (ECF No. 15) or to the Policy (ECF No. 1-2) which was appended to the Complaint.

Full-time Employees eligible for coverage under the Northrop Grumman Health Plan….".   Id.

Individual employees electing coverage under the Policy did not make any payments directly to LINA.   (ECF No. 15, at 3). Instead, Northrop Grumman, as the Subscriber to the Policy, paid the premiums directly to LINA within the calendar month in which they were due.   Id. at 2.   The company calculated the monthly premium based on the number of eligible employees who had elected coverage under the Policy as of the last weekend of the immediately preceding month, and submitted one lump sum payment covering the premium for all covered employees.   Id. at 3.   This monthly premium payment covered all individual employees participating in the Policy's coverage as of the last weekend of the immediately preceding month and provided coverage for the entire calendar month in which the premium was paid.   Id.   To recoup the cost of the premiums it paid, Northrop Grumman took bi-weekly payroll deductions from each covered employee's paycheck.   Id.   The entire cost of coverage under the Policy was charged to the covered employee in this fashion.   Id., See also (ECF No. 1-2 at 5).

On April 7, 2009, Northrop Grumman terminated Peter Shoop's employment due to a reduction in force.   (ECF No. 15 at 2). On April 28, 2009, Peter Shoop died as a result of a car accident.

4

Id.  Shoop's death is a loss which would be covered by the Policy so long as he was a Covered Person under the Policy at the time of his death. (See ECF No. 1-2, pp. 3, 6, 19)[2].

The definition of a Covered Person under the Policy is "An eligible person, as defined in the Schedule of Benefits, for whom an enrollment form has been accepted by Us [LINA] and required premium has been paid when due and for whom coverage under this Policy remains in force." (ECF No. 1-2 at 7). LINA admits that Peter Shoop was a Covered Person through April 8, 2009. (LINA's Resp. to Req. for Admissions, ECF No. 15 at 6). The Company claims, however, that his coverage terminated after that date and prior to his death on April 28, 2009.  The beneficiaries claim Shoop's coverage ended on April 30, 2009, and thus, he was a Covered Person at the time of his death.

Termination of coverage is addressed by the following language from the Policy:

**Termination of Insurance**

The insurance of a Covered Person will end on the earliest date below:

1.    the date this Policy ends;
2.    the date the insurance for the Covered Person's Covered Class ends;

---

[2] The Policy definitions of Covered Accident, Covered Injury, and Covered Loss encompass the circumstances of Peter Shoop's death. (ECF No. 1-2 at 7). The parties' dispute involves only the date upon which he ceased to be a Covered Person.

> 3. **the next premium due date after the date the Covered Person is no longer in a Covered Class;**
> 4. **the last day of the last period for which premium is paid;**
> 5. the next premium due date after the date the Covered Person attains the maximum Age for insurance under this Policy;
> 6. with respect to a Spouse or Domestic Partner or Dependent Child, the date of the death of the covered Employee or the date of divorce from the covered Employee unless the Spouse or Domestic Partner elects to continue insurance on Dependent Children.

(ECF No. 1-2, at 11-12) (emphasis added).   Subsections three (3) and four (4) are highlighted above as they are the only two termination provisions implicated in this case. (See Plntfs. Mem. Supp. Sum. J., ECF No. 14 at 11, Defs. Mem. Opp. Sum. J., ECF No. 26 at 10-11).

As relevant to these two provisions, Northrop Grumman paid the April 2009 premium payment to LINA.   (ECF No. 15 at 3). The April payment was calculated based on the number of eligible employees who had elected coverage as of the last weekend of March 2009.   Because Peter Shoop had elected coverage and was still employed in March, Northrop Grumman's April payment included a payment to maintain his coverage under the Policy through the end of April.   Id.

For no known reason, Northrop Grumman did not take a biweekly payroll deduction for the insurance from Shoop's final

6

paycheck for the payroll period of March 28, 2009 to April 10, 2009.[3] Id. After Peter Shoop's death, in Northrop Grumman's May 2009 premium invoice, LINA credited Northrop Grumman an amount equal to the amount of the April 2009 premium payment attributable to Shoop's coverage under the Policy. Id. at 4.

LINA's Policy also included a conversion provision, which provides an insured thirty-one (31) days to elect to convert to an individual policy after coverage under the Policy terminates. (ECF No. 1-2, at 14). A Covered Person who dies during this thirty-one day period, and prior to making any election, is awarded the amount of insurance he would have been entitled to convert. Id. Under this provision, LINA paid the beneficiaries $250,000 based on the Company's finding that Shoop's coverage had terminated sometime within the 31 days prior to his passing. (ECF No. 15, at 2). The beneficiaries, contending that Shoop's coverage had not terminated under the Policy, filed a claim with LINA for the additional $750,000 in coverage. Id. LINA denied that it owed any additional amount, and issued its final decision on July 1, 2010. Id. The beneficiaries filed this action pursuant to 29 U.S.C. §

---

[3] This language - "for no known reason" - follows the parties' stipulation, and no additional evidence is available to determine why Shoop's contribution to the premium was not withheld during the final two weeks he was employed by Northrop Grumman.

1132(a)(1)(B), contesting LINA's decision to deny full coverage under the Policy.

In addition to the Policy itself, a separate document, the Summary Plan Description ("SPD") describes the terms of coverage available to Peter Shoop under a variety of employee benefit programs. (See ECF Nos. 19-21, Bates No. 476-867). The SPD purports to delegate to insurers of specific benefits (in the case of the Policy, to LINA) the discretionary authority "to interpret the terms of the insurance or HMO coverage contract, including the eligibility for benefits." (ECF No. 20 at 38). The Policy itself contains no such delegation of authority. (ECF No. 1-2). The SPD also contains language purporting to describe the benefits available to Northrop Grumman employees and what happens to those benefits upon termination of employment. (ECF No. 19, Bates No. 508). The SPD states that, for employees terminated due to a reduction in force, coverage under the Policy stops on the employee's termination date. Id.

As to these stipulated facts the parties agree there are no material disputes, conceding that the beneficiaries' claim may be resolved by applying the stipulated facts to the terms of the Policy.

## B.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires the Court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986).   "A material fact is one 'that might affect the outcome of the suit under the governing law.'   A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party."   Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the Court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact.   Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25.   When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

9

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); See Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

## C.    RECOMMENDED CONCLUSIONS OF LAW

The Court's analysis begins with discerning the appropriate standard of review. Applying that standard and the stipulated facts to the language of the Policy the Court concludes that LINA's decision to pay benefits only under the Conversion Privilege was incorrect, as that privilege applies only after coverage under the Group Policy ends. Under the terms of the Policy, Peter Shoop's coverage had not ended on April 28 and thus he was covered on the date of his death. Accordingly, his beneficiaries should receive the remaining benefits due under the Policy.

## 1.    The Beneficiaries Claims Must be Reviewed De Novo

The beneficiaries filed this claim under ERISA. 29 U.S.C. § 1132(a)(1)(B).    The statute provides a civil remedy for

10

beneficiaries to recover benefits due them under the terms of an employee welfare benefit plan. Id. LINA concedes the Policy is an employee welfare benefit plan subject to ERISA's civil remedy.

As initially filed, the parties' cross motions presented the issue of whether LINA's action denying benefits should be reviewed de novo, or afforded the deferential, abuse of discretion standard of review in accordance with the discretionary review authority described in the SPD. (ECF No. 25, at 4-6). Because the Policy itself does not grant LINA discretionary authority to interpret its terms, the beneficiaries argued for a de novo standard, while LINA urged the more lenient abuse-of-discretion standard. See Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Feder v. Paul Revere Life Ins. Co., 228 F.3d 518, 522-23 (4th Cir. 2000).

Until May 2011, analyzing terms in the SPD which differed from, or supplemented the Plan documents involved a sometimes complicated factual analysis of the Covered Persons "reliance" on the conflicting language. Hendricks v. Central Reserve Life Ins. Co., 39 F.3d 507, 511 (4th Cir. 1994); Aiken v. Policy Mgt. Sys. Corp., 13 F.3d 138, 141 (4th Cir. 1993). The Circuits were sharply split in how they evaluated conflicting SPD terms under

11

ERISA.[4] However, the Supreme Court's recent decision in CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1878 (2011), resolved the division, holding that "…the summary documents, [such as the SPD] as important as they are, provide communication with beneficiaries *about* the plan, but…their statements do not themselves constitute the *terms* of the plan…" (emphasis in original).

The parties now agree, under the Amara decision, the terms of the Policy control over those of the SPD. (Defs. Mem., ECF No. 26 at 5). Thus, even though the SPD states that LINA has

---

[4] In 2007, the Fifth Circuit noted that:

[T]here appears to be a five-way circuit split regarding whether an ERISA claimant needs to establish reliance and/or prejudice based on the conflicting terms of an SPD. The Third and Sixth Circuits do not require a showing of reliance. See Burstein v. Ret. Account Plan for Employees of Allegheny Health Edu. and Research Found., 334 F.3d 365, 380-82 (3d Cir.2003); Edwards v. State Farm Mut. Auto. Ins. Co., 851 F.2d 134, 137 (6th Cir.1988). The Second Circuit also does not require a showing of reliance, but does require a showing of a likelihood of prejudice, which an employer may then rebut through evidence that the deficient SPD was in effect a harmless error. See Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 111-14 (2d Cir.2003). The Seventh and Eleventh Circuits require a showing of reliance. See Health Cost Controls of Illinois, Inc. v. Washington, 187 F.3d 703, 711 (7th Cir.1999); Branch v. G. Bernd Co., 955 F.2d 1574, 1579 (11th Cir.1992). The First, Fourth, and Tenth Circuits require a showing of reliance or prejudice, though it appears that the terms "reliance" and "prejudice" are sometimes treated synonymously. See Govoni v. Bricklayers, Masons & Plasterers International Union, Local No. 5 Pension Fund, 732 F.2d 250, 252 (1st Cir.1984); Aiken v. Policy Management Sys. Corp., 13 F.3d 138, 141 (4th Cir.1993); Chiles v. Ceridian Corp., 95 F.3d 1505, 1519 (10th Cir.1996). Finally, the Eighth Circuit requires a showing of reliance or prejudice, but only if the SPD is "faulty." See Palmisano v. Allina Health Sys., 190 F.3d 881, 887-88 (8th Cir.1999); Marolt v. Alliant Techsystems, 146 F.3d 617, 621-22 (1998).

Washington v. Murphy Oil USA, Inc., 497 F.3d 453, 458 n.1 (5th Cir. 2007).

sole discretion to interpret the terms of the Policy, the fact that this language is not included in the Policy itself, means LINA's administrative interpretation of the Policy terms is due no deference. See Amara, 131 S. Ct. at 1866; See also Firestone Tire & Rubber Co. v. Bruch., 489 U.S. 101, 115 (holding that de novo review is appropriate, unless the terms of the plan provide discretionary authority to the administrator to the interpret the terms of the plan).

The terms of an ERISA plan must be "established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). In this case, that instrument is the Policy. The Court must, therefore, review de novo the terms of the Policy to determine whether LINA correctly decided that Peter Shoop was not covered by the Group Policy on the date of his death.

The fact that the SPD's designation of discretionary authority to LINA is not part of the plan, however, does not render the SPD's provisions irrelevant. The Court may, when necessary, rely on extrinsic evidence, including the SPD, when deciding what the terms of the plan - in this case the Policy - mean. See Amara, 131 S.Ct. at 187.

13

## 2. The Conversion Privilege under the Policy only applies upon termination of coverage.

Prior to suit LINA paid benefits under the Conversion Privilege of the Policy, which appears designed to provide some protection to terminated or separated employees who wish to continue coverage. (<u>See</u> ECF 1-2 at 14). Its decision, LINA now argues, was reasonable in light of the terms of the Policy which it claims must be read in concert with the SPD. Unlike the Policy, the SPD unequivocally states that upon termination of employment "coverage stops on your termination date. You have 31 days to convert to an individual policy." (ECF No. 19, Bates No. 508). While this language may inform a proper reading of the Policy language, contract interpretation begins with the Policy itself. <u>See</u> <u>Glocker v. W. F. Grace & Co.</u>, 974 F. 2d 540, 543-44 (4th Cir. 1992); <u>See</u> <u>Amara</u>, 131 S.Ct. at 1883 ("An SPD is separate from a plan and cannot amend a plan unless the plan so provides.") (Scalia, J. concurring). Under that Policy language, the Conversion Privilege operates only after group coverage ends.

The Conversion Privilege of the Policy states:

If the Covered Person's insurance or any portion of it <u>ends for any of the following reasons</u>:

        a.    employment or membership ends;
        b.    eligibility ends;

the Covered Person may have Us [LINA] issue converted accident insurance on an individual policy or an individual certificate under a designated group policy."
. . .

The Covered Person must apply for the individual policy <u>within 31-days after his coverage under this Group Policy ends</u>.
. . .

If the Covered Person dies during this 31-day period as a result of an accident that would have been covered under this Group Policy, We will pay as a claim under this Group Policy the amount of insurance the Covered Person has entitled to convert.

(ECF No. 1-2 at 14) (emphasis added).

LINA contends that because Shoop was not employed at the time of his death, he was no longer eligible to participate in the Policy, and as such, Shoop's coverage had ended.

The Conversion Privilege, however, is not triggered by the date a Covered Person's employment or eligibility ends. Under the provision, eligibility and employment are listed as reasons why a Covered Person's insurance might end. This language merely distinguishes certain coverage terminating events which do give rise to conversion rights, from others which presumably do not. The event that triggers the thirty-one day Conversion Privilege is, as stated in the Policy, when the Covered Person's insurance ends. <u>Id.</u> In this case, LINA's decision to pay only Conversion benefits is correct only if Shoop's coverage had ended sometime

15

prior to his death on April 28, 2009. If Shoop was still covered under the Policy, the Conversion Privilege did not yet apply.

3.   **The plain language of termination provisions in subparagraphs (3) and (4) establish that Peter Shoop was still insured under the Group Policy on April 28, 2009.**

As payment under the Conversion Privilege is only triggered upon termination of the insurance, the Court must examine the Termination Provisions to determine when Shoop's coverage under the Group Policy ended. Only subparagraphs 3 and 4 of the termination language apply to the stipulated facts. The Court reviews each separately for clarity.

a. **Coverage ends under subparagraph 3 on "the next premium due date after the date the Covered Person is no longer in a Covered Class."**

The parties appear to agree that subparagraph 3, which applies to termination when an employee ceases to be a member of a Covered Class, would not terminate Shoop's coverage until May 1, 2009, three days after his death. (See Def. Mem. Opp. Sum. J., ECF No. 26, pp. 10-11). However, because LINA's argument challenges Shoop's continued group coverage on the basis of his termination from employment, the Court will review in some detail the facts supporting this agreed interpretation of subparagraph 3.

There is no dispute that Shoop was a member of a Covered Class through April 7, 2009. On that date he was a fulltime

16

employee, eligible for coverage under the Northrop Grumman health plan, who had elected coverage under the Policy. On April 8, 2009, the first day following Shoop's separation from the company, he ceased being a member of a Covered Class. The next premium due date after this date was May 1, 2009. (See ECF No. 15 at 3, Def. Mem. Opp. Sum. J., ECF No. 26 at 10, conceding that the "premium due date" is the first day of each month). Thus, Shoop's coverage under the Policy would not end under subparagraph 3 of the termination provisions until May 1, 2009.

This conclusion is important for two reasons. First, May 1, 2009 is after the date of Peter Shoop's accidental death. Second – and equally important to the Court's analysis – the language of subparagraph 3 expressly contemplates a short period of group coverage after the person is no longer in a Covered Class. This language rebuts LINA's contention that Shoop's coverage necessarily terminated the day he ceased to be a fulltime employee. The Company repeatedly claims that Peter Shoop's coverage must have ended on the date of his termination because only fulltime employees are eligible for coverage.[5] (Def. Mem. Opp. Sum. J., ECF No. 26, pp. 8, 9). While the

---

[5] In LINA's response to Requests for Admissions, the Company admits that Shoop was a "covered person through April 8, 2009", (ECF No. 15, at 6), a fact inconsistent (by one day) with its argument that coverage under the Policy required fulltime employment. In light of the conclusions reached in this Report, the undersigned need not rely on the Company's perhaps errant admission.

Policy does limit eligibility for coverage to fulltime employees, it does so through the mechanism of membership in a Covered Class. (See ECF No. 1-2 at 3) (noting "full time" employment as one of the requirements for membership in a Covered Class). (ECF No. 1-2 at 11) (defining eligibility as meeting "all of the requirements of a Covered Class"). The Schedule of Benefits contains no other limits on eligibility other than membership in a Covered Class. Subparagraph 3 of the termination provision plainly provides that an employee who is no longer eligible to be in a Covered Class (because he is no longer a fulltime employee) nevertheless has coverage under the Policy until the next premium due date - unless his coverage is terminated before that date under another one of the Termination Provisions.

Contrary to LINA's suggestion, there's nothing "internally inconsistent" with this reasonable period of continued coverage following termination, particularly where - as here - LINA receives full payment for the Covered Person's coverage. If LINA and Northrop Grumman intended to terminate coverage on the day any person ceased to be a member of the Covered Class, they could have easily agreed to do so in the language of the Policy. They did not.

**b.     Coverage ends under subparagraph 4 on "the last day of the last period for which premium is paid."**

Because LINA concedes Peter Shoop was a member of a Covered Class in April, and the language of subparagraph 3 unambiguously extended his coverage under the Policy until May 1, 2009, the Company focuses its termination analysis on subparagraph 4 which terminates coverage "on the last day of the last period for which premium is paid."  (ECF No. 1-2 at 11).

The parties stipulated that Northrop Grumman paid all premiums to LINA.  This stipulation is consistent with numerous Policy references to Northrop Grumman's obligation, as the Subscriber, to pay premiums (See ECF No. 1-2 at 11 beginning coverage upon "Subscribers . . . payment of the initial premium when due; at 16, requiring payment of premium on dates agreed to between LINA and Subscriber, and granting Subscriber a 60 day grace period to pay premium; at 19, providing that Subscriber may terminate coverage on any premium due date). The company's April payment included payment for the coverage Peter Shoop elected.  (ECF No. 15 at 3).  As a result, for the period of April 2009, LINA received a premium, paid by its Subscriber (Northrop Grumman) for Peter Shoop's coverage. Under the language of subparagraph 4 Shoop's group coverage did not terminate until April 30, the last day of that period.

19

LINA does not contest this reading of subparagraph 4. Indeed subparagraph 4 is the only termination provision to require payment of premium. It must refer to the Subscriber's premium payments, as these are the only premium payments made to LINA. Any construction of the word "premium" in this subparagraph which did not refer to the premiums paid to LINA would be nonsensical.

The Company argues, however, that the word "premium" in subparagraph 4 must be read to refer to both Northrop Grumman's premium payments on the Policy, as well as individual employees' contributions to those premium payments. Applying this dual meaning, LINA claims Peter Shoop's coverage terminated when the Company failed – "for no known reason" to withhold his contribution to the coverage from his last paycheck.

Recognizing the difficulty of a contract interpretation which is deliberately ambiguous, LINA argues that its reading is nonetheless necessary to avoid internal inconsistencies in the Policy, and to harmonize the Policy with the SPD, which unambiguously warns employees that their coverage under the Policy will end on their termination date. After reviewing the Policy language closely, the undersigned finds that payment of premium in subparagraph 4 refers only to the premium paid by Northrop Grumman on behalf of participating employees and not to

Northrop Grumman's collection of the employee's contribution to that premium. The alleged internal inconsistencies LINA cites either do not exist or would not be resolved by LINA's construction of the Policy. In addition, even if it were necessary to harmonize the terms of the Policy with inconsistent language in the SPD, LINA's construction of subparagraph 4 is no more consistent.

First, adopting the dual meaning LINA urges would seriously undermine the clear language of the Policy which requires Northrop Grumman as the Subscriber to pay the premiums as they become due. The term "premium" is not a defined term in the Policy, but other language in the Policy clarifies the parties' intent that Northrop Grumman would pay premiums and collect the cost of those premiums from its employees as "contributions." At page 5 of the Policy, the "mode of premium payment" is defined as "monthly." Moreover, the premium due dates are fixed as "the Policy effective date and the first day of each succeeding modal period." Only Northrop Grumman made monthly payments, Employee Contributions were collected from Peter Shoop bi-weekly. This premium payment language, which mirrors the language in subparagraphs 3 and 4 of the termination provisions, demonstrates that the premium referred to is the monthly premium paid by the subscriber Northrop Grumman. See McKeldin v.

21

Reliance Std. Life Ins. Co., 254 Fed. Appx. 964, 968 (4th Cir. 2007) (affirming a plain language interpretation of ERISA plan in part because "it is logical to assume that words were intended to convey the same meaning both times they were used"). In fact, LINA agrees that the term "premium due date" in subparagraph 3 of the Termination Provisions refers only to the first day of the month – the date Northrop Grumman's premium was due to LINA.

The Company advances three arguments in favor of its dual-meaning construction of subparagraph 4. First it claims the Policy (and the SPD) clearly envision the employee paying the entire cost of coverage, and thus, an employee's failure to pay should end his coverage. While this argument has some equitable appeal, it finds little support in the language of the Policy. The Policy document does state that "the cost of coverage is paid by the Employee", but this statement appears under the designation "Contribution". (ECF No. 1-2 at 6). The Effective Date provisions of the Policy require only that the employee "agree[] to make required contributions". After that agreement, coverage begins "provided the required first premium is paid." The Policy's use of the active voice to require the employee to "agree to make required contributions" – and the passive voice which leaves the payor of premiums unnamed, is consistent with

the construction of the Policy requiring the Subscriber to pay premiums to LINA and bear responsibility for collecting contributions for those premiums from its employees.  Finally, the administrative provisions of the Policy grant a 60-day grace period to the Subscriber for payment of required premiums, but specifically preserve coverage for a Covered Person during this 60-day grace period.  Id. at 16. This grace period highlights the fundamental problem with LINA's construction – the fact that employee contributions to premiums are not paid directly to LINA. Northrop Grumman retains ability to end coverage at any time, for any employee by withholding its payment to LINA of the premium for that employee.

The Company next argues that Peter Shoop's coverage must have ended because his annual compensation was reduced to zero on the day following his termination.  Because the amount of coverage available to employees is linked to their annual compensation, LINA claims the company must have intended that coverage would end on the day of termination.

This argument completely fails to address the language of the express provisions on termination of coverage – none of which fix the end of coverage to the exact date employment ends. In fact, the Policy clearly and separately addresses changes in the amount of coverage, which are qualitatively different from

the termination of coverage required to trigger conversion rights. (ECF No. 1-2, at 4, 11).

Because a change in the "amount of coverage" expressly anticipates continued coverage at some different amount, the language concerning the effective date of such changes was not intended to supersede the explicit provisions on termination of coverage as LINA now argues. See Bergin v. Office of Personnel Mgt., 120 F.3d 494, 498 (4th Cir. 1997) (interpreting ERISA plan courts must give greater weight to more specific and exact language than to more general language).

In fact, the language concerning changes in coverage due to a change in compensation appears in the section of the Policy labeled "Schedule of Benefits for Class 1." (ECF No. 1-2, at 4). Recall that subparagraph 3 of the Termination Provisions expressly provides that coverage continues for some period of time, perhaps as long as 30 days, after a person ceases to be a member of a Covered Class. Termination from fulltime employment would terminate membership in a Covered Class in every case, as Class 1 is only one Covered Class identified in the Policy and it is comprised solely of fulltime employees. Thus, accepting LINA's contention that Shoop's termination from fulltime status necessarily ended his coverage would nullify subparagraphs 3's express extension of coverage until "the next premium due date."

24

Goodman v. R.T.C., 7 F.3d 1123, 1127 (4th Cir. 1993) (contract terms must be construed "to give meaning and effect to every part of the contract rather than leave a portion of the contract meaningless or reduced to mere surplussage").

The Company's final argument in support of its alternating construction of the word "premium" in subparagraph 4 suggests its interpretation is more consistent with the SPD.  It is not.

The SPD, which purports to describe the Policy, unambiguously states that coverage under the Policy ends on the employee's termination date.  Neither subparagraph 3 nor subparagraph 4 of the Policy's termination provisions would consistently produce this result.  This is so regardless of whether the word "premium" in subparagraph 4 refers only to Northrop Grumman's required premium payment to LINA or also to its employee's contributions.  In both cases these payments are for a period of coverage which may – but likely will not – coincide exactly with the employee's termination date.  Thus, the Court's reading of subparagraph 4, limiting it to the Subscriber's required premium payment under the Policy, is no less consistent with the SPD.  In short, the SPD's description of the Policy is wrong, but under LINA's proposed construction of subparagraph 4 it would still be wrong.

25

Finally, LINA attempts to suggest that even Northrop Grumman had not paid a premium because LINA refunded the amount of premium attributable to Peter Shoop's coverage sometime in May 2009. The Policy language makes clear, however, that events - including payment or non-payment of premium - which occur after the date of loss do not affect coverage so long as the Covered Person was insured on that date. The Termination Provisions specifically state that "termination will not affect a claim for a covered loss . . . that occurs while coverage was in effect." (ECF No. 1-2 at 12). Thus, the fact that LINA attempted to return the premium payment after the date of loss is irrelevant to any analysis of Shoop's coverage on the date of his accidental death.

The language of the Policy plainly requires that termination of coverage coincide with a premium period. Had this tragedy befallen the Shoop family three days later, LINA's action would have been entirely correct, under two different provisions of the Policy. No doubt Peter Shoop's children would prefer to have had those three days with him than the result here recommended. But denied that, by unhappy fate, they are entitled to the benefits he procured for them for which LINA had been wholly compensated.

26

4.   **Attorney's fees and interest.**

The beneficiaries included a claim for attorney's fees and interest. (ECF No. 1 at 6).   Should the Court adopt the recommendation contained in this report, an award of prejudgment interest is discretionary.   See Mary Helen Coal Corp. v. Hudson, 235 F. 3d 207, 210-11 (4th Cir. 2000). Under ERISA a party achieving "some degree of success on the merits" may also receive an award of attorney's fees.   Williams v. Metropolitan Life Ins. Co., 609 F.3d 622, 634 (4th Cir. 2010) (quoting Hardt v. Reliance Std. Life Ins. Co., 130 S.Ct. 2149, 2159 (2010). Neither award is mandatory, but committed to the discretion of the Court.   Even a successful litigant "does not enjoy a presumption in favor of an attorneys' fee award."   Id.   The Fourth Circuit has identified five factors to guide the Court in determining when to award fees:

(1)   degree of opposing parties' culpability or bad faith;

(2)   ability of opposing parties to satisfy an award of attorney's fees;

(3)   whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;

(4)   whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5)   the relative merits of the parties' positions.

27

Williams, 609 F.3d at 635 (citing Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1029 (4th Cir. 1993) (en banc).

Neither party has briefed the issue of interest or attorneys' fees, nor have the Plaintiffs submitted any statement of fees. Because attorneys' fees and interest are only relevant if the Court adopts the recommendation in this report, the undersigned recommends that the Court direct further briefing on the issue of fees, if necessary, following action on the recommended disposition.

**D. RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the Court GRANT the beneficiaries' Motion for Summary Judgment, DENY LINA's Motion for Summary Judgment, enter judgment in favor of the beneficiaries for the balance of the coverage elected in the amount of $750,000.00, and direct further briefing on the Plaintiffs' claims for prejudgment interest and attorneys' fees.

**E. REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of

mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

July 19, 2011

29

## Clerk's Mailing Certificate

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

Joseph Franklin Verser, Esq.
Robyn Hylton Hansen, Esq.
Jones, Blechman, Woltz & Kelly, PC
701 Town Center, Drive, Suite 800
Newport News, VA  23606

Brian Allen Calub, Esq.
Nelson, Mullins, Riley, Scarborough, LLP
Meridian 17th Floor
1320 Main Street
Columbia, SC  29201

Richard Hooper Ottinger, Esq.
Vandeventer Black, LLP
500 World Trade Center
Norfolk, VA  23510

William Clifford Wood, Jr.
Nelson, Mullins, Riley, Scarborough, LLP
P. O. Box 11070
Columbia, SC  29211

Fernando Galindo, Clerk

By   _____
     Deputy Clerk
     _____,2011